**Dale E. MEEKS, [SSN: 494–60–7032], Plaintiff,**

v.

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

No. 96–6111–CV–SJ–BC–SSA.

United States District Court, W.D. Missouri, St. Joseph Division.

Dec. 30, 1997.

Allan D. Seidel, Miller, Seidel, Havens & Adkins, Trenton, MO, for Plaintiff.

Jerry L. Short, U.S. Atty.'s Office, Kansas City, MO, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Plaintiff Dale E. Meeks seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, *et seq.* Plaintiff argues that the hypothetical posed by the Administrative Law Judge ("ALJ") did not accurately set forth all of plaintiff's impairments, and the vocational expert was not asked about jobs that exist in the national economy but only testified about jobs that exist in the St. Joseph area which is 90 miles from plaintiff's home. I find that (1) the hypothetical posed to the vocational expert adequately took into consideration all credible limitations, (2) the ALJ's finding that the Commissioner satisfied his burden of proving that there are jobs in the economy which plaintiff can perform is supported by substantial evidence, and (3) the ALJ's determination that plaintiff is not disabled is supported by substantial evidence. Therefore, plaintiff's motion for summary judgment will

be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On April 21, 1994, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since April 1, 1994. Plaintiff's disability stems from tuberculosis, shortness of breath and back pain. Plaintiff's application was denied initially and upon reconsideration. On April 20, 1995, a hearing was held before an Administrative Law Judge. On June 15, 1995, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 31, 1996, after consideration of additional medical evidence, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

■ Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g), *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

■ Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401; *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Id.; Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

■ An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen*, 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker*, 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.* The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

   Yes = not disabled.

   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

   No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff, his wife, and vocational expert Anita Howell in addition to documentary evidence admitted at the hearing. A summary of plaintiff's medical records and the testimony follows.

## A. SUMMARY OF MEDICAL RECORDS

The medical records provided to the ALJ begin with a visit by plaintiff to Dr. Jay Keuhn on May 28, 1993 (Tr. at 180). At that time, plaintiff weighed 229 1/4 pounds (Tr. at 180). He complained of his chest aching, coughing, fever, eyes mattering (Tr. at 180). He stated that he had been trying to cut back on smoking and was down to 1 pack per day (Tr. at 180). Plaintiff stated, "I don't want any x-rays or that stuff ... I just want a shot or whatever." The medical notes indicate that plaintiff was very nervous and jumpy (Tr. at 180). Dr. Keuhn prescribed Keflex and Codimal and gave plaintiff an injection (Tr. at 180).

On November 24, 1993, plaintiff again saw Dr. Keuhn (Tr. at 180). By then, plaintiff's weight was up to 237 pounds—up almost seven pounds since he last saw Dr. Keuhn six months before (Tr. at 180). Plaintiff complained of shortness of breath (Tr. at 180). He was smoking one to two packs of cigarettes per day (Tr. at 180). Dr. Keuhn prescribed Flexeril, Keflex, and Codimal and gave plaintiff an injection (Tr. at 180).

Six months later on April 5, 1994, plaintiff again saw Dr. Keuhn (Tr. at 180). Plaintiff, weighing 236 pounds, complained of coughing, a sore throat, and shortness of breath (Tr. at 180). Dr. Keuhn prescribed Keflex (Tr. at 180).

The record indicates that on the same day, plaintiff saw Dr. Thomas Mais at the Wright Memorial Hospital (Tr. at 151, 217) Dr. Mais indicated that plaintiff had "extensive pleural and parenchymal scarring involving both lungs. Numerous calcified granulomas." (Tr. at 151, 217). Three days later, on April 8, 1994, Dr. Keuhn prescribed inhalers for plaintiff (Tr. at 180).

On April 21, 1994, plaintiff saw Dr. Scott Lerner at Wright Memorial Hospital for a pulmonary consultation at the request of Dr. Keuhn (Tr. at 155–156). The reason for the testing was listed as "Cig smoker for 20 [1] years, 25 cigs/day, hasn't quit, Short of breath at rest, Wheeze or asthma, ... Painful Breathing, No Freq. Cough." (Tr. at 155–156). Dr. Lerner's interpretation was "Moderate obstruction with reduced FUC. Post test shows no significant effect." (Tr. at 155–156). That same day, Dr. Lerner wrote a letter to Dr. Keuhn (Tr. at 157–158) indicating that plaintiff had a "35 pack year smoking history and smokes 1 1/2 packs of cigarettes per day." Dr. Lerner conducted a physical examination and noted "patient's oral hygiene is very poor". He stated that "This patient has mild chronic airflow obstruction and I believe that he has physical deconditioning. Both of these factors contribute to his dyspnea [shortness of breath]." Dr. Lerner put plaintiff on 40 mg of prednisone per day for two weeks to be decreased to 30 mg per day after that. Dr. Lerner also wrote, "I have urged the patient to stop smoking and to begin an exercise program so that he might lose weight." (Tr. at 157–158).

On May 13, 1994, plaintiff again visited Dr. Lerner (Tr. at 160–161). Following the exam, Dr. Lerner wrote a letter to Dr. Keuhn stating that plaintiff continued to complain of extreme shortness of breath with minimal exertion and also complained of right-sided subcostal chest pain (Tr. at 160–161). Dr. Lerner performed complete pul-

---

1. The number is nearly illegible but appears to     be "20".

monary function tests and a CT scan of the chest. The CT scan showed bilateral upper lobe scarring and scattered calcifications. He stated that the pulmonary infiltrates are a consequence of plaintiff's healed tuberculosis. The pulmonary function tests revealed a mild degree of airflow obstruction with a mild reduction in the total lung capacity. Dr. Lerner stated that the reduction in the total lung capacity is a consequence of plaintiff's scarred lungs, and that his airflow obstruction is "secondary to his chronic cigarette smoking." He further stated that "I believe that this patient's dyspnea is a consequence of several factors, to include the following: (a) Reduction in lung volume as a consequence of previous tuberculous infection; (b) chronic airflow limitation; (c) physical deconditioning; (d) obesity." Dr. Lerner ended his letter with the following:

> In discussing this situation with Mr. and Mrs. Meeks, it became obvious that Dale is not extremely committed to his own welfare from a health standpoint. He smokes excessively, he eats excessively, and he has gained over 30 pounds in the last year.... I advised the patient to stop smoking, lose weight, and to begin a regular exercise program.... Hopefully, Dale will change his life-style in an effort to reduce his dyspnea. (Tr. at 160–161).

On May 24, 1994, Dr. Jeffrey Cramp, Milan Family Practice Clinic, sent a letter to Fay Knight of Disability Determinations (Tr. at 162–166). In the letter he noted that plaintiff was seeing a chiropractor three times a week and had done so since he was in an automobile accident several years earlier. He stated that plaintiff had a right acromionectomy for a right shoulder injury but "that does not seem to bother him at this time." He further noted that plaintiff "has a 35 pack year history with smoking 1 1/2 packs of cigarettes per day. He is presently down to a 1/2 pack per day." Plaintiff's weight was listed at 238 pounds. He had full range of motion throughout his spine. Dr. Cramp found moderate obstructive lung disease, chronic low back pain most likely secondary to strain associated with the motor vehicle accident, prior acromionectomy without apparent residual effects, moderately over-

weight, tobacco abuse and nicotine addiction (Tr. at 162–166).

On August 15, 1994, plaintiff saw Dr. Keuhn[2] and complained that it was hard to breathe, he was coughing, and he was experiencing chest pains (Tr. at 216). Plaintiff weighed in at 244 1/2 pounds (Tr. at 216). Dr. Keuhn prescribed Daypro, Prozac and Librax (Tr. at 216). On September 20, 1994, Dr. Keuhn changed plaintiff's prescription to Zoloft since it was noted that Prozac cost too much (Tr. at 216).

On January 18, 1995, plaintiff again saw Dr. Keuhn and complained of breathing problems, congestion, light-headedness, and a dry cough (Tr. at 216). Plaintiff weighed 245 1/2 pounds (Tr. at 216). Dr. Keuhn prescribed medications and an inhaler (Tr. at 216).

On June 26, 1995, tests were performed at the Midwest Pulmonary Consultants (Tr. At 11, 219). Plaintiff weighed 243 pounds at that time (Tr. at 11, 219). The result was that "moderate airway obstruction is present." (Tr. at 11, 219).

On July 15, 1995, an x-ray examination was conducted by Dr. Thomas Mais at Wright Memorial Hospital (Tr. at 17). Dr. Mais wrote "Extensive fibrocalcific scarring is seen involving both lungs without apparent change when compared to films of 04–05–94." His impression was "extensive fibrocalcific scarring involving both lungs without apparent change." (Tr. at 17).

The final doctor visit depicted in the record was on July 18, 1995, when plaintiff saw Dr. Keuhn and complained of weakness and chest pains (Tr. at 16). Plaintiff indicated that he was "tired all the time" (Tr. at 16). He weighed 240 pounds at that time. The doctor indicated that plaintiff was to "take meds as directed" (Tr. at 16).

## B. SUMMARY OF TESTIMONY

During the hearing, plaintiff and his wife testified, and vocational expert Anita Howell testified at the request of the ALJ.

---

2. It appears to be Dr. Keuhn's records as the form and handwriting are the same.

### 1. Plaintiff's testimony.

Plaintiff complains of breathing difficulty and back trouble (Tr. at 59). Plaintiff's back problems have plagued him since he was 15 years old but plaintiff has always been able to work despite his back pain (Tr. at 59). The only doctor plaintiff sees about his back problems is a chiropractor (Tr. at 69). Plaintiff contracted tuberculosis in 1988 or 1989 (Tr. at 60). He was treated with medication but claims that his breathing problems have continued to worsen (Tr. at 60).

Plaintiff testified that at the time of the hearing, he was 40 years old and was 6' 1" tall (Tr. at 52). Although plaintiff testified that he weighed 225 pounds, when questioned by the ALJ about the doctor's reports indicating plaintiff weighs approximately 245 pounds, plaintiff stated that he hadn't paid attention when the doctor weighed him (Tr. at 52–53). Plaintiff lives in a one and one-half story house; however, he does not go to the second story as his bedroom and bathroom are on the first floor (Tr. at 51). Plaintiff lives with his wife and her three children, ages 14, 11 and 6 (Tr. at 51). Plaintiff has a 20–year–old daughter who supports herself (Tr. at 52).

Plaintiff graduated from high school and attended vocational school for truck driving and for building trades (Tr. at 55). The truck driving school was an eight-week course, and the building trades school was approximately one year (Tr. at 55). Plaintiff can read, add, subtract, and multiply (Tr. at 56). Plaintiff served almost four years in the United States Navy from July 1972 until April 1976 (Tr. at 57). Plaintiff was stationed in Honolulu and worked as an engineman (Tr. at 57).

Plaintiff worked for Frank Griffin [3] hauling hogs until he quit on April 1, 1994, and has not worked since then (Tr. at 53, 55, 61). During his employment with Griffin, plaintiff had considerable exposure to pig dust on dry days and had to wear a mask (Tr. at 60). Plaintiff's doctor told him that the pig dust "kept infecting the scars from the tuberculosis" (Tr. at 61). Plaintiff quit this job because of his breathing problems (Tr. at 71). Plaintiff does not believe he can return to the truck-driving occupation because climbing into the truck pops his back out of place and he has to climb, twist "and everything" to get into the truck (Tr. at 71). In addition, his breathing problems and physical limitations would prevent him from loading trucks (Tr. at 71). Plaintiff does not believe he is physically capable of performing even sedentary work because he sometimes runs out of air just sitting and watching television (Tr. at 72).

Plaintiff's daily activities include driving the children about three blocks to the bus each morning (Tr. at 62). Since his wife works nights and gets home around 7:00 or 7:30 in the morning, she sleeps during the day and plaintiff answers the phone during the day if it rings (Tr. at 62). Plaintiff spends his days watching television or visiting his parents who live about three blocks away (Tr. at 62, 66). Although plaintiff could walk to his parents' house if he stopped about four times, he usually drives there (Tr. at 66).

Plaintiff testified that he can only walk on a level surface about 40 to 60 feet before he has to stop because he runs out of air and gets dizzy (Tr. at 67). Plaintiff can only stand for about 30 minutes before he has to sit or lie down (Tr. at 68). Plaintiff can sit for 30 minutes to an hour at most because of his back problems (Tr. at 69). Plaintiff testified that he can carry a gallon of milk or the trash without trouble, and that the most he could carry would be about 25 pounds (Tr. at 69). Plaintiff has trouble lifting objects over his head because he had part of his shoulder socket removed when he was in the military (Tr. at 69–70).

Plaintiff's wife and her children do most of the household chores (Tr. at 63). Plaintiff does not assist with many tasks because he "run[s] out of air too easy" (Tr. at 63). Plaintiff's wife does the grocery shopping, and plaintiff does not help her because he "[doesn't] pick out the right stuff" (Tr. at 64). He can physically walk up and down the aisles in the grocery store, but he has to stop a lot (Tr. at 64). Plaintiff and the children carry grocery bags into the house (Tr. at 64). Plaintiff does not take the trash out because he has to walk up hill about 40 feet and that

---

**3.** Frank Griffin is a farmer who has less than five employees.

"really bothers" him (Tr. at 64). Although plaintiff used to vacuum and clean before he got married in either November 1991 or November 1992, his wife's kids now perform those tasks so that they can earn their allowance (Tr. at 64–65). Plaintiff had to quit remodeling his house sometime before April 1994 because the sawdust made him dizzy and he ran out of air (Tr. at 65). Plaintiff does cut the grass with a riding lawn mower which takes him about an hour (Tr. at 63).

Although plaintiff drives to visit his parents on a daily basis and testified that he "can drive a long ways", he testified that he sometimes falls asleep while driving his car (Tr. at 66, 74). Plaintiff believes this is caused from a lack of oxygen and fatigue (Tr. at 66). Plaintiff drove an hour and a half to the administrative hearing (89 miles) (Tr. at 74, 77). Although he testified that he had to stop once during the trip, when questioned further by the ALJ, plaintiff stated that he did not stop until he reached St. Joseph where the hearing was held (Tr. at 77).

Plaintiff has also fallen asleep while sitting in his home talking to someone (Tr. at 67). When plaintiff runs out of air, he gets dizzy and disoriented (Tr. at 73). Sometimes he has to go lie down (Tr. at 73). This "running out of air" occurs six to seven times each day and lasts for 15 to 20 minutes (Tr. at 73). Cold, wet days make plaintiffs breathing problem worse (Tr. at 67).

Plaintiff testified that he smokes about a pack of cigarettes a day (Tr. at 74). Although plaintiffs doctor has told him to quit smoking, he has not been able to because he is addicted to tobacco and because his wife smokes (Tr. at 75). At one point, plaintiff stopped smoking for a month, and another time he quit for a little over a week back in 1988 or 1989 (Tr. at 75, 76). Plaintiff's doctors have also told him to lose weight; however, plaintiff has actually gained weight (Tr. at 79).

### 2. Plaintiff's wife's testimony.

Plaintiffs wife, Christina Meeks, testified that at the time of the hearing she and plaintiff had been married about two years and are expecting a child (Tr. at 83–84) Plaintiff's wife is a registered nurse who works nights (Tr. at 86–87).

Mrs. Meeks testified that plaintiff sometimes gets out of breath simply after bending down to tie his shoe (Tr. at 85). If plaintiff tries to get dressed too fast, he will become out of breath and will have to sit down and rest (Tr. at 85). Mrs. Meeks testified that it is difficult for plaintiff to think clearly (Tr. at 85). She stated that several years ago, plaintiff used to play ball with the kids, wrestle with them, ride bicycles or go fishing; however, he cannot do any of that anymore (Tr. at 87–88). Plaintiff now falls asleep for three to four hours a day (Tr. at 88). Mrs. Meeks testified that plaintiff gets angry and upset over his condition, and that he is reluctant to talk about it even to her (Tr. at 88). She stated that plaintiff will often make up excuses for why he suddenly has to sit down (Tr. at 88). Mrs. Meeks testified that although plaintiff drove himself and her to the hearing, he fell asleep twice during the trip and "about run us off the road" (Tr. at 89). She stated that plaintiff drove because it was raining and she does not drive well in the rain (Tr. at 89).

Mrs. Meeks testified that she and plaintiff thought plaintiff's condition would improve after he quit working as a truck driver; however, it has gotten progressively worse (Tr. at 86). She believes that the steroid medication plaintiff is taking has caused him to gain weight (Tr. at 87). Mrs. Meeks testified that plaintiff has tried to quit smoking (Tr. at 88). She said that plaintiff's doctor suggested he try the nicotine patch, but that plaintiff decided he could not afford it since it cost too much (Tr. at 88). Mrs. Meeks said that plaintiff smokes about a pack a day and that he used to smoke two to two and a half packs per day (Tr. at 89). This reduction in the number of cigarettes smoked per day occurred over the last six months (Tr. at 90).

### 3. Vocational expert testimony.

Vocational expert Anita Howell testified at the request of the ALJ. In response to the first hypothetical: that plaintiff suffers from chronic low back pain, has a history of pulmonary tuberculosis in the 1980's, he currently suffers a mild chronic airflow obstruction, he has a moderate obstructive lung

disease, he had part of his shoulder socket removed, he abuses tobacco and is obese, he can occasionally lift 25 pounds, frequently lift 10 pounds, cannot remain on his feet all day but would have to either sit or sit and stand, and could not work in hot surroundings or in polluted surroundings but would need a controlled environment (Tr. at 92–93). Ms. Howell testified that under those circumstances, plaintiff would not be able to return to his past work as a truck driver (Tr. at 93). Ms. Howell testified that such a person, however, would be able to perform light or sedentary jobs such as counter sales clerk, cashier, stocker inventory clerk, security monitor, assembler, product inspector and hand packager (Tr. at 93–940). She further testified that those jobs are available in the St. Joseph area as follows:

> Counter sales clerk: 75 sedentary positions, 250 light category positions (employee could alternate sitting and standing).
> Cashier: 64 sedentary and 50 light.
> Stock inventory clerk: 75 light category.
> Security monitor: 40.
> Assembler: 65 sedentary, 120 light.
> Product inspector: 12 sedentary and 54 light.
> Hand packager: 2 sedentary and 75 light (Tr. at 94–95).

All of the light category positions allow for a sit/stand option (Tr. at 95). This list provided by the vocational expert is a representative list, it is not all inclusive as there are other jobs in addition to those listed above (Tr. at 95).

Because plaintiff has a criminal conviction for which he served prison time, he probably would not qualify for the security monitor jobs and may not qualify for about half the other jobs simply because he has been convicted of a felony (Tr. at 96). Ms. Howell testified that there would still be a substantial number of jobs that a person with these limitations, even though he has been in the penitentiary, could perform (Tr. at 96).

The ALJ then posed a second hypothetical to Ms. Howell, that is, whether a person described by plaintiff and Mrs. Meeks in their testimony would be capable of performing any jobs in the economy. (Tr. at 96). Ms. Howell testified that such a person would not because of his falling asleep while

he is just sitting or driving and that he runs out of breath just from sitting (Tr. at 96).

## C. FINDINGS OF THE ALJ

In determining that plaintiff was not entitled to a period of disability or disability insurance benefits, the ALJ found that plaintiff's testimony was not credible in light of the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir.1984). The ALJ found that the record contains few reported observations of third parties including physicians concerning plaintiff's daily activities; the duration, frequency, and intensity of his alleged symptoms; precipitating and aggravating factors; or functional restrictions (Tr. at 25). The ALJ noted the following inconsistencies:

1. Plaintiff testified that his doctor said that other than medication, there was nothing that could be done about plaintiff's condition. However, medical records submitted by Dr. Lerner indicate that he advised plaintiff to stop smoking, lose weight, and exercise to improve his condition (Tr. at 23).

2. Plaintiff's wife testified that during the 90–minute drive to the hearing, plaintiff fell asleep at the wheel twice nearly running them off the road; however, plaintiff testified that he made the drive and only had to stop once after he reached St. Joseph (Tr. at 24).

3. Plaintiff testified that although his attorney told him that vocational rehabilitation was available, plaintiff's doctor advised him against taking advantage of that program and plaintiff tries to pay attention to his doctor (Tr. at 24).

4. On April 21, 1994, plaintiff saw a pulmonologist and complained that he was short of breath but has had no chest pain. However, in another medical document, plaintiff complained of suffering from chest pain "most of the time" (Tr. at 25).

5. During a May 24, 1994, doctor visit, plaintiff reported that his shoulder does not seem to bother him at this time. However, at the hearing he tes-

tified that he is unable to lift things above his head (Tr. at 26).

6. In May 1994, plaintiff was able to exercise on a treadmill for about 16 minutes before he stopped due to shortness of breath. When asked about this at the hearing, plaintiff testified that he pushed himself to do it and afterward he thought they would have to "haul" him out of there (Tr. at 26).

7. In May 1994, plaintiff had a complete pulmonary function test which showed a mild degree of airflow obstruction attributed to plaintiffs scarred lungs and that his airflow obstruction was secondary to his chronic cigarette smoking. The pulmonologist also found that plaintiff's shortness of breath was due to his physical deconditioning and his obesity (Tr. at 26).

8. Plaintiff testified that he was able to drive 90 miles in 90 minutes to the hearing and he sat for over an hour during the hearing without lying down; however, he testified that he could only sit for 30 minutes to an hour due to his back problems. The ALJ also noted that plaintiff was able to provide cogent answers to the questions posed and did not appear to fall asleep or need to lie down during the hearing (Tr. at 27).

9. Plaintiff testified that because of his shoulder surgery, he can only lift 25 pounds; however, at his last job which he performed until April 1994, plaintiff was required to lift over 100 pounds at times and to lift 50 pounds frequently (Tr. at 27).

The ALJ likewise did not find plaintiff's wife to be credible. The ALJ found that Mrs. Meeks' testimony that plaintiff fell asleep almost running the car off the road twice during the drive to St. Joseph "unlikely" in view of the fact that she allowed him to continue to drive for the entire journey (Tr. at 27). The ALJ further noted that "[a]lthough her testimony that he sleeps for several hours during the middle of each day and that he does very little housework may be true, there is no reason to conclude that his medical conditions require him to limit his activities or sleep during the day." (Tr. at 27).

Despite the finding that plaintiff's testimony was not credible, the ALJ stated that he gave plaintiff "every benefit of the doubt with regard to any conflicts or contradictions contained in the clinical and laboratory findings of record." (Tr. at 27). With that, that ALJ made the following findings with regard to plaintiffs physical abilities:

[Plaintiff] is limited to lifting and carrying 25 pounds on an occasional basis. He can frequently lift up to 10 pounds. He is unable to be on his feet for an entire work day but he could sit for an entire day or perform a job that allowed him to alternate between standing and sitting an entire day or perform a job that allowed him to alternate between standing and sitting to maximize his comfort. As a result of his breathing problems, he cannot work in a hot or polluted environment but, instead, can only work in an environment that is controlled (Tr. at 27).

Because the vocational expert testified that a person with these limitations could not perform plaintiffs past relevant work, the burden shifted to the Commissioner to demonstrate that there were jobs that exist in the national economy in significant numbers that plaintiff could perform. The vocational expert identified those jobs. The ALJ then stated that he could "find no vocational impediments to [plaintiff's] ability to successfully perform [those] jobs, considering [plaintiffs] age, education, work experience, and functional limitations" and found that those jobs exist in significant numbers in plaintiffs geographic region (Tr. at 28).

Therefore, plaintiff was denied benefits at the fifth step of the sequential analysis.

## V. ALJ'S HYPOTHETICAL TO THE VOCATIONAL EXPERT

Plaintiff argues that the ALJ's hypothetical to the vocational expert resulting in testimony that there are jobs that plaintiff can perform did not include a listing of the nature of impairments which impacted upon plaintiff's ability to work. He also argues that the vocational expert improperly testified only to the availability of jobs in the St. Joseph area and did not testify as to jobs available in the national economy.

■ Whether hypothetical questions were posed properly is determined by reviewing the administrative record as a whole and considering credibility findings, vocational factors, medical evidence, subjective complaints, and corroboration of plaintiff's impairments by third parties. *Cruse v. Bowen,* 867 F.2d 1183, 1184–85 (8th Cir.1989). Hypothetical questions posed to a vocational expert need only include those impairments that the ALJ accepts as true. *Long v. Chater,* 108 F.3d 185, 188 (8th Cir.1997); *Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir. 1997).

■ Vocational expert Anita Howell was given the following hypothetical by the ALJ: Plaintiff suffers from chronic low back pain, has a history of pulmonary tuberculosis in the 1980's, he currently suffers a mild chronic airflow obstruction, he has a moderate obstructive lung disease, he had part of his shoulder socket removed, he abuses tobacco and is obese, he can occasionally lift 25 pounds, frequently lift 10 pounds, cannot remain on his feet all day but would have to either sit or sit and stand, and could not work in hot surroundings or in polluted surroundings but would need a controlled environment.

Ms. Howell described several jobs which are available in the St. Joseph area that plaintiff would be able to do. About half of those jobs were eliminated because of plaintiff's prior felony conviction.

Plaintiff takes issue with the ALJ's failure to include the limitations on plaintiffs ability to stand, walk, lift, and remain alert. However, the hypothetical included a lifting and standing limitation, the jobs testified to by the vocational expert did not require walking, and the ALJ properly excluded the limitation on remaining alert since he found no credible evidence that plaintiff suffers from that restriction.

Therefore, plaintiff's argument that the hypothetical was not proper is without merit.

■ Plaintiff next argues that the vocational expert's testimony about available jobs was not sufficient to satisfy the Commissioner's burden because the testimony only related jobs available in the St. Joseph area and not in the "national economy" as required. This argument too is without merit.

■ Section 423(d)(2)(A), Title 42, United States Code, states that "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. The Commissioner is not required to show that plaintiff would be hired if he applied for possible jobs or that job opportunities exist within the local area. *Dressel v. Califano,* 558 F.2d 504, 508–509 (8th Cir.1977). "While such factors as whether the work he could do exists in his local area, or whether there are job openings, or whether he would or would not actually be hired may be pertinent in relation to other forms or protection, they may not be used as a basis for finding an individual to be disabled". Sen.Rep. No. 744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. & Admin.News, pp. 2881–82.

Congress, tightening the definition of disability, eliminated consideration of travel difficulties when those difficulties were extrinsic to the claimed disability; the length and expense of commuting and the resulting inconveniences were no longer to influence a disability determination. A person, otherwise able to work, is in effect offered a choice: he can choose either to commute the distance to his job or he can move closer and avoid the expense and inconvenience. Disability insurance is not available to fund his decision to live far from available jobs.

*Lopez Diaz v. Secretary of HEW,* 585 F.2d 1137, 1140 (1st Cir.1978). *See also Miller v. Finch,* 430 F.2d 321, 324 (8th Cir.1970) (need not show that jobs exist within a reasonable distance from plaintiffs home).

Because the Commissioner is not required to prove that jobs exist in the entire national economy or that jobs exist in plaintiff's neighborhood but only that jobs exist in a region of the economy (in this case, the St. Joseph area which is at most 90 miles from plaintiffs residence), plaintiffs argument is without merit.

## V. SUBSTANTIAL EVIDENCE

■ Plaintiff argues that the ALJ's decision is not supported by substantial evidence because there is no residual functional capac-

ity assessment made by any physician. Plaintiff argues that the ALJ attempts to justify his conclusion by finding plaintiff not credible and that the medical records clearly show a diagnosis of significant medical problems as the result of tuberculosis and also show that medication has not been helpful.

Questions of fact, including the credibility of a plaintiff's subjective testimony, are primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987). Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. Consideration must be given to all relevant factors, including plaintiff's prior work record; observations by third parties and treating and examining physicians; plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984) (subsequent history omitted). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. *McClees v. Shalala*, 2 F.3d 301, 303 (8th Cir.1993); *Polaski*, 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995); *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir.1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. *Robinson*, 956 F.2d at 841.

In this case, the ALJ explicitly discredited plaintiff's testimony (although gave him the benefit of the doubt on several "limitations" which do not appear to be substantiated), and gave legally sufficient reasons for doing so. The ALJ outlined the factors listed in *Polaski* and, contrary to plaintiff's assertions, found that plaintiff's work record had no affect on his credibility. However, the ALJ outlined many inconsistencies (some of which are listed above and will not be repeated here) in plaintiff's and his wife's testimony. He noted testimony of plaintiff and his wife which contradicted each other, which defied reason, and which had absolutely no support in any of the records submitted by plaintiff. I find that the ALJ properly discounted the testimony of both plaintiff and his wife.

As to the medical records, they show that plaintiff occasionally went to the doctor complaining of shortness of breath; that he repeatedly ignored directions to lose weight, stop smoking, and begin an exercise program; that his shortness of breath problems were partially caused by his smoking, obesity, and lack of exercise; that plaintiff is not committed to his own welfare from a health standpoint; and that although plaintiff and his wife testified that his shortness of breath had gotten much worse in the last few months, x-rays of plaintiff's lungs taken on July 15, 1995, showed no change when compared to films of April 5, 1994. The medical records consistently indicate that the worsening of plaintiff's condition is a result of his excessive use of tobacco, his excessive eating, and his lack of any physical activity. In addition, the medical records show that plaintiff's doctors prescribed medication (which plaintiff claims does not work) ALONG WITH exercise, weight loss, and complete cessation of tobacco use.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995); *Stout v. Shalala*, 988 F.2d 853, 854 (8th Cir.1993); *Warford v. Bowen*, 875 F.2d 671, 673 (8th Cir.1989). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. *Roth v. Shalala*, 45 F.3d at 282. Plaintiff was advised on numerous occasions by his doctors to quit smoking, lose weight, and begin an exercise program, yet as of the day of the hearing he continued to smoke at least a pack of cigarettes per day, was heavier than he had been in years, and was still not engaging in any exercise. Therefore, even if the ALJ had found credible plaintiff's testimony regarding his physical limitations, it would not be a basis for finding plaintiff disabled since the medical evidence shows that these limitations are partially caused by

plaintiff's extremely long history of smoking cigarettes, his obesity, and his inactivity.

Based on all of the above, I find that the ALJ's decision is supported by substantial evidence in the record.

## VIII. CONCLUSIONS

For the reasons stated above, I find that (1) the hypothetical posed to the vocational expert adequately took into consideration all credible limitations, (2) the ALJ's finding that the Commissioner satisfied his burden of proving that there are jobs in the economy which plaintiff can perform is supported by substantial evidence, and (3) the ALJ's determination that plaintiff is not disable is supported by substantial evidence. Therefore, it is

ORDERED that plaintiffs motion for summary judgment is denied.